**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| EDWIN SMITH PRESTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:17-cv-2876-JPM-cgc |
| v. | ) | |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment filed by Defendant Federal Express Corporation ("FedEx") on November 14, 2018. (ECF No. 37.) In this lawsuit, Preston asserts that FedEx terminated his employment because he is white, because he is male, and in retaliation for reporting this alleged discrimination within the company. (Amended Complaint, ECF No. 16 at ¶ 1.) FedEx argues that it discharged Preston because he cursed while speaking with a security guard and because he pulled over a FedEx tractor-trailer on public roads. (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 323, 325[1].) For the reasons set forth below, the Motion for Summary Judgment is DENIED.

---

[1] References to page numbers in docket entries are to CM/ECF PageID numbers.

# I.    Background

## a.  Factual Background

Preston was hired by FedEx as a Senior Safety Specialist on December 1, 2004.  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591.)  As a Senior Safety Specialist, Preston was responsible for enforcing FedEx safety rules.  (Dep. of Irene Parker, ECF No. 45-9 at 1293.)  On November 8, 2012, Preston received a warning letter for "disruptive behavior" in connection with a confrontation with a coworker.  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2211; Dep. of Ronnie White, ECF No. 46-5 at 1828-33; Dep. of Irene Parker, ECF No. 45-9 at 1321-22.)[2]  Warning letters are formal disciplinary statements by FedEx that may accompany a suspension or termination.  (Dep. of Irene Parker, ECF No. 45-9 at 1312-13; Acceptable Conduct, ECF No. 37-9 at 510 ("Warning Letters serve as a notification of behavioral deficiency.").)

In 2013, Irene Parker, an African-American woman, became Preston's manager.  (Dep. of Edwin Preston, ECF No. 45-3 at 1071; Affidavit of Irene Parker, ECF No. 37-10 at 524.)  Parker in turn reported to senior manager Keither Toperzer.  (Dep. of Irene Parker, ECF No. 45-9 at 1289, 1311-12.)  When deposed, Parker testified that she supervised the day-to-day activities of safety specialists and had the discretion to impose discipline.  (Dep. of Irene Parker, ECF No. 45-9 at 1297-98; see Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2212.)  Eight security specialists, including Preston, reported to Irene Parker between her promotion to manager in 2013 and Preston's termination in November 2015.  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591-92; Dep. of Irene Parker, ECF No. 45-9 at 1301.)

---

[2] It does not appear that the 2012 warning letter itself is in the record.

*i. The October 2015 Warning Letter*

On September 16, 2015, Preston had to drive from the FedEx central hub to his office to collect documents for a meeting later that night. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598; Dep. of Edwin Preston, ECF No. 45-2 at 809.) There was no company car available for Preston, so he rode as a passenger with fellow Security Specialist Laura Jewell. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598; Dep. of Edwin Preston, ECF No. 45-2 at 808.) Preston stated that he was "very anxious" because he only had about ten minutes to get to his meeting. (Dep. of Edwin Preston, ECF No. 45-2 at 808.)

Jewell pulled up to the security gate, which was manned by security officer Keva Banks, to leave the FedEx hub. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598, 602.) Feeling agitated because of a delay at the gate, Preston said something to the effect of, "Come on. We've got shit to do. The badge is going to scan the same." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598; Dep. of Edwin Preston, ECF No. 45-2 at 812 (stating "I don't remember exact words that I said, but it sounds like me… So I would not dispute it."); see also Dep. of Edwin Preston, ECF No. 45-2 at 812 (responding affirmatively when asked "you were agitated because you had to get your stuff and make it back for a meeting with a senior manager; you were running late?").) Parker investigated this incident, collected a statement by Jewell, interviewed Banks, and had a conversation with Preston. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 602; Dep. of Irene Parker, ECF No. 45-9 at 1466-72; Report of Irene Parker, ECF No. 46-7.) Parker discussed her investigation with Toperzer, Human Resources advisor Greg Richards, and Managing Director Thomas Lopez, who all concurred with the decision to discipline Preston for his behavior. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 602; Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214; Dep. of Irene Parker, ECF No. 45-9 at 1327-28; 1332 (testifying that she submits

draft warning letters to Human Resources and to her senior manager before she issues them); Richards-Lopez-Parker Emails, ECF No. 46-6 at 1946-47[3].)

On October 5, 2015, Parker issued Preston a warning letter, which imposed a two-day suspension without pay. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214-15; Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616; see also October 5 Warning Letter, ECF No. 45-5 at 1238.) The warning letter stated:

> You displayed disrespect towards another employee by using profane language in your interaction with her. Specifically your profanity was directed towards [s]ecurity personnel during the execution of her duties. The investigation revealed, as corroborated by a witness, that you did initiate this misconduct. This conduct is similar to past behaviors for which you received disciplinary actions. Upon completion of our investigation, it was determined that your conduct was in violation of the Acceptable Conduct Policy, P2-5[.]

(October 5 Warning Letter, ECF No. 45-5 at 1238.)[4] On October 7, 2015, Preston appealed the warning letter and the two-day suspension using FedEx's Guaranteed Fair Treatment Procedure ( "GFTP"). (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616.) At the end of the appeal process, management's decision was upheld. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616-17, 619.) On October 8, 2015, Preston filed an internal complaint (referred to by the parties as an "internal EEO" or an "IEEO") with FedEx alleging that he was discriminated against by Parker because of his race, age and sex. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216; Def.'s Resp. to Pl.'s Requests for Admissions, ECF No. 45-1 at 646; Dep. of Edwin Preston,

---

[3] FedEx includes this document in its blanket objection that certain exhibits "contain inadmissible speculation, hearsay and conclusory statements." (Reply Supp. Mot. Summ. J., ECF No. 52 at 2199.) This statement is not hearsay. Fed. R. Evid. 801(d)(2)(D). The Court overrules FedEx's evidentiary objections as to the documents cited in this Order.

[4] FedEx objects that both of the 2015 termination letters should not be considered by the Court because Plaintiff has failed to properly authenticate them. (Reply Supp. Mot. Summ. J., ECF No. 52 at 2199.) Preston does not have to present evidence in an admissible format at this stage; instead, he need only rely on evidence that *will be* admissible. Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009). The Court finds that this evidence will likely be authenticated through the testimony of FedEx employees.

ECF No. 45-2 at 820-22.) During a conference call on October 13, 2015, Parker was told that Preston had filed this internal complaint against her. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217.)

*ii. The November 2015 Warning Letter*

In the early morning hours of November 11, 2015, Preston saw a FedEx 18-wheel truck run a stop sign on Republican Drive in Memphis, Tennessee. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 621; Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2222.) Preston blew his horn, flashed his lights, and pulled the truck over. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 629-30; see also Dep. of Edwin Preston, ECF No. 45-2 at 844-45.) Preston issued a Safety Observation Warning to the truck driver, Samuel Williams. (Preston-McLeod-Richards Email, ECF No. 48-11 at 2180.)

On November 12, 2015, FedEx suspended Preston with pay pending an investigation into a potential violation of FedEx policy in connection with the stop of Williams's truck. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.) Toperzer and Parker conducted that investigation. (Dep. of Irene Parker, ECF No. 45-9 at 1584 ("I only conducted part of the investigation and when I turned it over to Keith Toperzer and he did his portion of it").) During a meeting on November 19, 2015, Parker and Toperzer informed Preston that FedEx would terminate him. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633.) During that meeting, Preston was given a warning letter and termination notice signed by Parker. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633; Dep. of Irene Parker, ECF No. 45-9 at 1587.) The Warning Letter and termination notice stated:

> On November 11, 2015, near the Memphis Hub and public roadways of Republican, Democrat and Tchulahoma, you committed an unsafe act while on duty

5

in a Company vehicle. Specifically, your actions in the pursuing and stopping a FedEx Express Tractor Trailer on a major public roadway caused an unsafe situation, potentially impacted service to our customers, and initiated a confrontation with a driver during the course of his route. You previously had been directed not to block a vehicle in the process of investigating a possible safety violation. Upon completion of our investigation, it was determined that your conduct was in violation of the Acceptable Conduct Policy (P2-5), a copy of which is attached for your review. As a result of your behavior, this Warning Letter is being issued.

A review of your disciplinary history indicates that you have received three Warning letters within the past five years for similar misconduct:

1. November 19, 2015
2. October 5, 2015
3. November 8, 2012.

The Acceptable Conduct Policy (P2-5) provides that recurrent patterns of misconduct cannot be tolerated. Therefore, your employment is terminated effective today.

(Warning Letter/Termination, ECF No. 48-3 at 2105.)

Preston appealed his termination through the GFTP, in part based on claims that his termination was retaliatory and discriminatory. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2229; Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633.) Management's decision was upheld. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633.) Preston's position was filled by an African-American male. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2213.)

### b. Procedural Background

Preston alleged race and sex discrimination in connection with his October and November suspensions in a Charge of Discrimination filed with the Equal Employment Opportunities Commission ("EEOC") on November 13, 2015. (Charge of Discrimination, ECF No. 1-1 at 24.) On November 19, 2015, Preston filed an amended charge, claiming that he was discharged in retaliation for filing a previous internal complaint and for filing his initial EEOC Charge.

(Amended Charge of Discrimination, ECF No. 1-1 at 26.)  Preston received a right-to-sue letter from the EEOC on September 7, 2017. (Dismissal and Notice of Rights, ECF No. 16-2 at 122.)

Preston filed this lawsuit on December 5, 2017 and filed an amended complaint on January 11, 2018.  (ECF Nos. 1, 16.)  Preston brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, asserting unlawful discrimination on the basis of sex and race and unlawful retaliation for legally protected activities, including the filing of internal complaints and an EEOC Charge of Discrimination.  (Amended Complaint, ECF No. 16 at ¶ 1.)

FedEx filed this Motion for Summary Judgment on November 14, 2018.  (ECF No. 37.)  Preston filed a response on December 12, 2018.  (ECF No. 44.)  FedEx replied on January 4, 2019.  (ECF No. 52.)  Preston filed a sur-reply on January 11, 2019.  (ECF No. 56.)

### c.  Undisputed Facts

At this stage, the following facts are undisputed:

1. "Plaintiff Edwin Preston ('Preston') was hired by FedEx as Senior Safety Specialist on December 1, 2004."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591.)

2. "At the time he was hired, Ronnie White ('White') (Black Male) served as Preston's manager, and he continued to work in that capacity until leaving the company in 2013."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591.)

3. "Under Manager Ronnie White, between 2005 and 2012, Preston fully met or exceeded expectations in Annual Appraisals."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

4. "Preston incurred a Warning Letter in 2012, following a disagreement with co-worker, Tom Burk[e]. The Letter 'expire[d]' on November 8, 2013." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2211.)

5. "Throughout the time Irene Parker ('Parker') (Black Female) worked and was Preston's manager, there were eight Safety Specialists in the group, including two Caucasian males – Preston and Thomas Burke ('Burke"), one Caucasian female – Laura Jewell ('Jewell'), two African-American males – M.A. Winn ('Winn') and Reginald Miller ('Miller') and three African American females – Marcey Atkins-Burks ('Burks'), Marlene Douglas ('Douglas') and Chery Chatman ('Chatman')." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591-92.)

6. "Currently, Parker supervises 9 Specialists, 1 of which is a White male." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2213.)

7. "Parker states the day-to-day supervision of specialists, including discipline, is left to her discretion. Parker states she decides on whether an OLCC is issued." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2212 (internal citations omitted).)

8. "An OLCC can be counseling or compliment. It can also be to document advice on an aspect of the job." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2212 (internal citations omitted).)

9. "Parker inputs the explanation for OLCCs into PRISM." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2212.)

10. "Chatman has never received an OLCC while Parker has been manager." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

11. "In 2015, during a staff meeting, Parker told Preston to 'shut up,' when he complained about not being consulted on a new 'Safety Above All II' program." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 592.)

12. "Approximately two weeks after the 'shut up' comment, Parker told Preston that he 'was a safety specialist and did not get to go on record' regarding a corporate safety rule change pertaining to employees securing their hair prior to operating equipment or driving equipment." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 592.)

13. "Within one week of Parker stating that Preston did not 'get to go on record,' Preston reached out to Senior Manager Keith Toperzer to schedule a meeting to discuss Parker's comments. During this meeting, Preston did not say he believed Parker's comments were sex- or race-based." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 592.)[5]

14. "On September 16, [2015], Preston did not have an available company car for use during his shift, so his co-workers gave him rides to various meetings." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598.)

15. "Preston got a ride from fellow Security Specialist Laura Jewell from the hub to his office." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598.)

16. "While in the car with Jewell, when they approached the security gate, Preston was agitated and began venting, saying something to the effect of 'Come on. We've got shit to do. The badge is going to scan the same.'" (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 598.)

---

[5] Plaintiff purports to dispute several of Defendant's facts on the basis of inferences Plaintiff believes may be drawn from those facts. (See Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at ¶ 6 ("Disputed to the extent that the statement infers Preston only complained about these remarks by Parker at his meeting with Toperzer on August 27, 2015.").) The statements of material fact speak for themselves; to dispute an application of stated facts is not a genuine dispute of the facts themselves.

17. "Parker took a written statement from Jewell, in which Jewell stated Preston was rude, loud, and used foul language." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 601.)

18. "Parker interviewed the security guard, Keva Banks." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 602.)

19. "Parker also interviewed Preston and asked him to describe what occurred." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 602.)

20. "When interviewing Preston on September 17, 2015, Preston asked Parker if she needed his statement, but she told him it was unnecessary." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

21. "Parker told Preston there was a video of him at security on September 16, 2015, but she refused to show it to him when he asked to see it." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

22. "On September 21, 2015, Parker compiled a report based on her investigation for Toperzer, Richards, and Lopez." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

23. "Parker discussed the investigation… with her senior manager (Keith Toperzer, a white male) and human resources advisor (Greg Richards, a white male), both of whom agreed that discipline was warranted." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 604.)[6]

24. "On October 5, 2015, Parker issued Preston a Warning Letter with 2-day suspension without pay. It does not refer to an unsafe act." (Def.'s Resp. Pl.'s Add. Material Facts,

---

[6] Plaintiff responds to this statement of fact with twelve pages of argument. (See Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 604-16.) Plaintiff does not dispute that Parker discussed her investigation with Toperzer and Richards. (Id.) Plaintiff does not dispute that both agreed that discipline was warranted. (Id.) Instead, Plaintiff discusses the underlying merits of Parker's investigation and various evidence of alleged discrimination and disparate treatment. (Id.) Again, the statements speak for themselves.

ECF No. 53 at 2214-15 (internal citations omitted); <u>see also</u> Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616.)

25. "When given the Warning Letter, Preston told Parker and the witness security manager that the suspension was discrimination, but both managers did not respond." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2215.)

26. "Parker never before issued an OLCC, or Warning Letter for alleged profanity. White also never gave an OLCC for using a curse word at work." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2215 (internal citations omitted).)

27. "Parker knew of no past OLCCs or discipline to Preston for profanity." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2215.)

28. "Chatman, Winn, Jewell used the word, 'shit' while at work with Parker as manager. Parker has also used the word 'shit' at work. Swearing and profanity by Specialists historically occurred in the workplace." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2215-16 (internal citations omitted).)[7]

29. "On October 7, 2015, Preston appealed the October 5, 2015, warning letter and suspension using FedEx's GFTP process." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616.)

30. "On October 8, 2015, Preston filed an IEEO alleging Parker discriminated against him because of sex and race." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216.)

31. "On October 8, 2015, Richards requested Toperzer to have Parker enter her 'Management Rationale' for issuing the Warning Letter and suspension." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216.)

---

[7] Defendant disputes these facts "to the extent they imply that use of the word 'shit' in a colloquial manner during conversation can be equated to Plaintiff's behavior of cursing out a member of FedEx security and behaving in a derogatory and disrespectful way toward a coworker." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216.) The statements speak for themselves.

32. "In his GFTP complaint, Preston alleged that Laura Jewell ('Jewell') received different treatment following a 'run-in' with security personnel at the truck gate." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 617.)

33. "Jewell did not swear or use profanity during her 'run-in' with security guard, Colin Hall ('Hall')." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 617.)

34. "Preston's EEO was the first and only EEO filed against Parker." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217.)

35. "On October 13, 2015, Preston, Parker, Toperzer, Lopez, and Richards took part in a GFTP telephonic conference regarding the October 5 Warning Letter. On this call, Preston stated he filed an IEEO against Parker and therefore objected to her continued participation on the call." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217 (internal citations omitted).)

36. "At the GFTP telephonic conference on October 13, 2015, Preston was told the EEO would be handled through a difference process." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217.)

37. "Parker states she did not know about the EEO, and does not recall Preston citing it as a basis for her to exit the call, but recalls being asked to exit the call." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217.)

38. "Parker was told about the EEO before the teleconference call on October 13." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217-18.)

39. "Parker never said anything to Preston that led him to believe she knew about his IEEO complaint prior to his objection to her participation in the GFTP Step 1 conference call." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 619.)

40. "Preston's appeal of the October 2015 Warning Letter went through all three stages of FedEx's GFTP process, and at each stage management's decision to issue Preston's Warning Letter was upheld."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 619.)[8]

41. "In the early morning hours of November 11, 2015, Preston observed a FedEx driver named Sam Williams driving an 18-wheel FedEx tractor trailer, with a FedEx cab hooked to a 53-foot trailer."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 621.)

42. "Sam Williams was an African-American FedEx Ramp Transport Driver."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2218.)

43. "After Sam Williams was outside of the FedEx gates, Preston observed Williams run a stop sign on Republican Drive."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 621; see also Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2222.)

44. "Preston was concerned for Williams' state of mind because it was past 3:30 am, he ignored a stop sign, did not see his safety car, or hear his horn."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2222.)

45. "At this time, Preston worried Williams may cause an accident was [sic] on a public road, in FedEx equipment, operating under a FedEx logo, and as a representative of FedEx."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2222.)

46. "Preston pulled up beside Williams, blowing his horn and flashing his lights in an effort to get Williams' attention to pull him over."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 629.)

---

[8] Plaintiff disputes this statement "to the extent the statement infers this was an objective process and was not tainted by Parker's previous discriminatory actions against him, her deficient and incomplete investigation, or her omissions regarding similar or worse behavior by her female Specialists."  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 619.)  Plaintiff does not dispute that management's decision was upheld at all three stages of the appeals process.  (Id.)

47. "Preston… pull[ed] into the right hand turning lane in front of Williams." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 630; <u>see also</u> Dep. of Edwin Preston, ECF No. 45-2 at 844-45.)[9]

48. "Preston initiated a conversation with Williams, during which Williams refused to provide Preston with his identification." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 630.)

49. "Preston then called FedEx security and waited until they arrived." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.)

50. "Until security arrived, there were no witnesses to the interaction of Preston and Williams." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2218.)

51. "When FedEx security arrived, Williams provided Preston with a copy of his identification." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.)

52. "Parker made no written request or suggestion for discipline of Williams." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2227.)

53. "Williams received no OLCC or discipline as a result of his interaction with Preston on November 11." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2227.)

54. "Parker agrees a Specialist may pull over a vehicle running a stop sign at the Hub, as long as the Specialist determines it is safe do so. A Specialist may also use the car horn or headlights at night when pulling over a vehicle." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2218 (internal citations omitted).)

---

[9] Plaintiff disputes that he "cut [Williams] off" but otherwise acknowledges that "he pulled ahead of Williams after Williams already began slowing to a stop." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 630; <u>see also</u> Dep. of Edwin Preston, ECF No. 45-2 at 844-45.)

55. "On November 11, 2015, Toperzer asked Preston about the incident with Sam Williams and asked Preston to prepare a statement, describing what occurred." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.)

56. "On November 12, 2015, FedEx placed Preston on suspension with pay pending an investigation into his potential violation of FedEx's People Manual Policy 2-5 – Acceptable Conduct, a copy of which was provided to Preston." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.)

57. "Parker obtained a statement from Williams, which was provided to Parker by Williams' manager." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 631.)

58. "Parker reviewed the underlying circumstances (of Preston pulling over Williams on a public road) with both her manager Toperzer and her human resources advisor, Greg Richards." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 632 (insertion in original).)

59. "Preston went to the main screening building on November 19, 2015, at which time he met with Parker and Toperzer, who informed him that FedEx was terminating his employment. Parker provided Preston with a Warning Letter / Termination Letter during the meeting, which Preston refused to sign." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633 (internal citations omitted).)

60. "Parker did most of the talking, and told Preston he was fired because this was his third Warning Letter." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2227.)

61. "Parker denies writing the Termination Warning Letter, despite signing it. Parker admits to no knowledge if the Termination Letter accurately records Preston pulling over Williams potentially impacted FedEx services… However, Parker states she still agreed with the

basis for Preston's termination." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2227.)

62. "Preston appealed his termination though the FedEx GFTP program." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633.)

63. "Preston's appeal of the November 2015 Termination Letter went through all three stages of FedEx's GFTP process, and at each stage management's decision to terminate Preston's employment was upheld." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633.)

64. "During GFTP Step 1 on December 3, 2015, Richards suggested alternatives to pulling over Williams such as identifying the truck number, but Preston explained to Richards and Lopez he was unable to do this, but needed to address Williams' unsafe act... Preston explained pulling Williams over was performed safely and did not violate any written safety rule, and therefore was not an unsafe act. He also stated Williams could be asleep or incapacitated. Richards also suggested Preston should have called dispatch, but Preston replied he did not have the number at hand and had not been instructed to do this. Preston reiterated the asset number of the truck was not visible to him because it was dark. On December 4, Lopez upheld the decision." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2229 (internal citations omitted).)

65. "On December 16, Preston engaged in GFTP Step 2 with Richards and Vice-President Alexander. Alexander did not discuss alternative ways of dealing with Williams, but stated she had reviewed a video of the incident. Preston requested to view it, but was denied. Preston again stated his termination was retaliation and discrimination, but was told these were not issues for the GFTP process. On January 4, 2016, Alexander upheld the decision." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2229 (internal citations omitted).)

66. "After Preston was terminated, Chatman and Winn were not interviewed about Chatman's disagreement with Preston in October 2014." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2218.)

67. "Preston's position was filled by an African American male." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2213.)

68. "M. A. Winn stopped a FedEx truck outside of the FedEx World Hub to speak with the driver about failing to stop at a stop sign on Republican Drive." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 635.)

69. "Winn actually stopped and spoke with the driver at another FedEx facility prior to the driver returning to the city streets." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 635.)[10]

70. "FedEx received notification of [Preston's EEOC] Charge on November 18, 2015." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 636.)

71. "Neither Parker, nor Toperzer, nor Richards had access to or knowledge of Preston's EEOC Charge on November 18, 2015 when the Charge was provided to FedEx by the EEOC." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 636.)

## II.    Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would

---

[10] Plaintiff disputes this statement "to the extent the statement infers Winn's intent was to pull over the vehicle at the slip of road where he ended up pulling the vehicle over." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 635.)  The statement speaks for itself.

establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [a] court construes all reasonable inferences in favor of the nonmoving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

To "show that a fact is, or is not, genuinely disputed," both parties must "cit[e] to particular parts of materials in the record," which show "that the materials cited do not establish the absence or presence of a genuine dispute" or "that an adverse party cannot produce admissible evidence to support the fact." Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting Celotex, 477 U.S. at 325).

The decisive "question is whether 'the evidence presents a sufficient disagreement… or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells

v. Cingular Wireless Employee Services, LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)).  "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor."  Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251).

"The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'"  Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).  A party opposing summary judgment need not proffer evidence in an admissible form, but "the party opposing summary judgment must show that she _can_ make good on the promise of the pleadings by laying out enough evidence that _will be_ admissible at trial to demonstrate that a genuine issue on a material fact exists."  Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis in original).

### III.     Discrimination - Prima Facie Case

#### a.  Substantive Law

Title VII of the Civil Rights Act makes it illegal for any employer to discharge any individual because of that person's sex or race.  42 U.S.C. § 2000e-2.  A plaintiff may prove a violation of Title VII through direct or indirect evidence.  See Johnson v. Kroger Co., 319 F.3d 858, 865–66 (6th Cir. 2003).

"[T]o compensate for the fact that direct evidence of intentional discrimination is hard to come by," the Supreme Court has articulated a test for evaluating indirect evidence of Title VII violations. Price Waterhouse v. Hopkins, 490 U.S. 228, 271, 109 S.Ct. 1775, 1801–02, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Under the McDonnell Douglas framework, a plaintiff may make a prima facie case of discrimination through indirect evidence by first showing that: (1) he is a member of a protected group; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class or treated differently from similarly-situated members of an unprotected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

"The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination." Leadbetter v. Gilley, 385 F.3d 683, 690 (6th Cir. 2004). "In such cases, a plaintiff satisfies the first prong of the prima facie case by demonstrating background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id. (internal citations and quotation marks omitted). "In our view, the 'reverse discrimination' complainant bears the burden of demonstrating that he was intentionally discriminated against 'despite his majority status.'" Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985) "To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." Leadbetter, 385 F.3d at 690 (internal citations and quotation marks omitted). In a reverse discrimination case, the first and fourth prongs should be viewed separately. "Showing that similarly situated employees of other races were treated differently than the plaintiff is an independent evidentiary requirement… holding that such evidence also satisfies the background

circumstances requirement would collapse a four-legged test into a three-legged one." <u>Treadwell v. Am. Airlines, Inc.</u>, 447 F. App'x 676, 679 (6th Cir. 2011).

### b. Analysis

"FedEx does not contest the second or third prongs of Preston's *prima facie* case" for discrimination, namely that he suffered an adverse employment action and that he was qualified to work as a Senior Safety Specialist. <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. (Def.'s Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 328.) Instead, FedEx argues that Preston cannot demonstrate background circumstances that FedEx discriminates against men or white people. (Def.'s Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 328.) FedEx also claims that Preston cannot point to similarly-situated minority or women employees who were treated more favorably than he was. (<u>Id.</u> at 333-34.)

### i. Background Circumstances – Race and Sex

Preston argues that he can demonstrate background circumstances that FedEx discriminates against white people and against men because Parker is an African-American woman. (Pl.'s Resp. Opp. Mot. Summ. J., ECF No. 44 at 569.) The Sixth Circuit has held that showing that the decisionmaker in question is a racial minority or a woman is "sufficient" to satisfy the background circumstances requirement. <u>Zambetti v. Cuyahoga Cmty. Coll.</u>, 314 F.3d 249, 257 (6th Cir. 2002). FedEx contends that the Court should reject this interpretation of <u>Zambetti</u>, because the African-American decisionmaker in that case "had consistently promoted other African American employees over white employees; and… made the promotional decision while disregarding the recommendation of a selection committee." (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 330.)

FedEx's argument is unpersuasive for several reasons. First, the Sixth Circuit itself has stated that "Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the prima facie case." Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008). Second, FedEx's interpretation that Zambetti holds that one must show consistent promotion of racial minority employees over white employees would suggest that the Court should combine the background circumstances and similarly-situated comparator requirements; such an understanding would collapse a four-part test into a three-part test. See Treadwell, 447 F. App'x 676, 679 (6th Cir. 2011). Third, the Sixth Circuit has also noted that "the 'background circumstances' prong, only required of 'reverse discrimination' plaintiffs, may impermissibly impose a heightened pleading standard on majority victims of discrimination." Zambetti, 314 F.3d at 257. This suggests that the Court should adopt a permissive understanding of the "background circumstances" requirement. Id. Fourth, the Sixth Circuit found that the selection committee in Zambetti relied on by FedEx could not be relied on in reaching a decision. Zambetti, 314 F.3d at 257 ("We agree with the district court that how frequently Chief Harris disregarded the [Selection Advisory Committee]'s recommendation is meaningless without knowing how many times the committee recommended someone with less seniority.") The selection committee in Zambetti was only relevant (if at all) in that, by disregarding it, the police chief made clear that the promotion decision at issue was his alone. See id.

This leads to FedEx's next argument that Preston cannot show sufficient background circumstances. FedEx claims that Zambetti simply does not apply, because the decisions to discipline and terminate Preston were made collectively with Toperzer and Richards, two white men. (Def.'s Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 331-32.) FedEx argues, in other words,

that even if the decisionmaker's minority status is sufficient to show background circumstances, Parker was not the only decisionmaker.  (Id.)  See Ford v. Chad Youth Enhancement Ctr., No. 3:08-CV-635, 2010 WL 1177334, at *10 (M.D. Tenn. Mar. 24, 2010) (holding that a plaintiff cannot demonstrate "background circumstances" solely through the minority status of a manager if the decision was made by multiple managers, including managers of plaintiff's race).

FedEx's argument fails at this stage because there is a genuine dispute as to the involvement of Toperzer and Richards in the decision to discipline and discharge Preston.  Preston argues that Parker was the "driving force" behind FedEx's decisions, and heavily influenced the disclosure and interpretation of facts to higher-ups, including Toperzer and Richards.  (Pl.'s Resp. Opp. Mot. Summ. J., ECF No. 44 at 5170.)  Parker testified that she never instituted discipline "without getting the input from HR," but answered affirmatively when asked "it's up to you whether you issue the warning letter, correct?" (Dep. of Irene Parker, ECF no. 45-9 at 1327-28.)  Although Parker also testified that "if my HR says to put it in or not to put in, I'm going to go along with whatever that HR, direction that HR gives me," her statement may reasonably suggest that Parker defers to human resources on the wording of warning letters, but not necessarily the decision to issue them.  (Id. at 1329.)  As stated above, the parties do not dispute the following facts:

- "Parker states the day-to-day supervision of specialists, including discipline, is left to her discretion."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2212 (internal citations omitted).)

- "On September 21, 2015, Parker compiled a report based on her investigation [of the cursing incident] for Toperzer, Richards, and Lopez."  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214.)

- "Parker discussed the investigation… with her senior manager (Keith Toperzer, a white male) and human resources advisor (Greg Richards, a white male), both of whom agreed that discipline was warranted." (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 602.)

- "On October 5, 2015, Parker issued Preston a Warning Letter with 2-day suspension without pay." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2214-15 (internal citations omitted); see also Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 616.)

Viewed in the light most favorable to Preston, these facts would support a reasonable inference that Parker had the power to discipline her employees, which she exercised by suspending Preston for his interaction with Banks. While Toperzer and Richards "agreed" with Parker's decision, that does not necessarily mean that they influenced or critically evaluated it. A jury could reasonably conclude that the decision to suspend Preston in October 2015 was made by Parker.

Drawing all reasonable inferences in Preston's favor, Parker might have also made the determination to issue the third and final warning letter and to terminate Preston. Although Parker denies having written the termination letter, she admits to having signed it. (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633; Dep. of Irene Parker, ECF No. 45-9 at 1587.) The parties do not dispute that Parker "did most of the talking" during Preston's termination meeting. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2227.) As stated above, there is evidence that Parker made the decision to issue warning letters. (Dep. of Irene Parker, ECF no. 45-9 at 1327-28.) Despite Parker's denial of authorship, a jury may reasonably conclude based on this evidence that Parker made the decision to terminate.

Under Sixth Circuit law, the identity of the decisionmaker is sufficient to satisfy background circumstances in a reverse discrimination case. <u>Arendale</u>, 519 F.3d at 603. Parker, an African-American woman, may have decided to issue the two warning letters at issue in this case. Preston has therefore identified a genuine dispute as to the first prong of a prima facie case for reverse discrimination on the basis of race and sex.

### ii. Similarly Situated Employees

"The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather… the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir.1998) (internal citation and quotation marks omitted). "Courts… should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." <u>Id.</u>; <u>see also</u> <u>Jackson v. FedEx Corp. Servs., Inc.</u>, 518 F.3d 388, 396 (6th Cir. 2008) (cautioning against an "exceedingly narrow" formulation of the similarly situated standard and requiring a "true independent determination of the relevant factors").

Preston claims he was treated worse than Safety Specialist Chery Chatman, an African-American woman, for substantially similar conduct. (Pl.'s Resp. Opp. Mot. Summ. J., ECF No. 44 at 572.) Parker testified that Chatman made "inappropriate comments" to Safety Specialist Marlene Douglas based on Douglas's Jamaican ancestry. (Dep. of Irene Parker, ECF No. 45-9 at 1426-27; Dep. of M.A. Winn, ECF No. 45-4 at 1219-20 (answering that Marlene Douglas cried at a meeting involving Chatman's statements about Douglas's Jamaican ancestry).) Parker testified that no investigation took place because Douglas chose "not to proceed", but also stated that a

human resources manager personally heard these disparaging comments. (Dep. of Irene Parker, ECF No. 45-9 at 1427-28.) When viewed in the light most favorable to Preston, Douglas's choice not to proceed with an internal complaint is irrelevant, because the personal presence of a human resources professional gave FedEx sufficient evidence to discipline Chatman. Preston's statement to a security officer, while impolite, may not necessarily have been an angry or harassing remark, especially because casual profanity was common at FedEx. (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2215-16.) A reasonable jury could find Preston's single use of profanity less egregious than Chatman's comments about national origin. Such a finding would support a prima facie showing of discrimination on the basis of race and sex.

There is also a genuine dispute as to whether Preston was similarly situated to Safety Specialist M.A. Winn, an African-American man. (See Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 591-92.) There is evidence that Winn sometimes referred to Marlene Douglas as "Marley." (Dep. of Irene Parker, ECF No. 45-9 at 1341.) Irene Parker testified that she warned Winn to stop using this nickname, but only because it was not Marlene Douglas's name. (Dep. of Irene Parker, ECF No. 45-9 at 1342-43.) A reasonable jury may conclude that this nickname is a reference to Bob Marley, a Jamaican singer-songwriter, and another joke about Douglas's heritage. There is no evidence that Parker issued a warning letter to Winn for these comments, even though Parker testified that Douglas did not like the nickname. (See Dep. of Irene Parker, ECF No. 45-9 at 1341 (discussing her decision to issue an OLCC to Winn but not a more severe warning letter); see also Def.'s Resp. to Pl.'s Requests for Admissions, ECF No. 45-1 at 646 (admitting that "Defendant does not regard [an OLCC] as disciplinary in nature").) A reasonable jury may conclude that Parker's actions represent willful ignorance of an offensive joke about national origin that is worse

than Preston's interaction with Banks.  When the evidence is viewed in the light most favorable to Preston, Winn engaged in similar conduct and was not disciplined.

A jury may reasonably find that Winn was also similarly situated to Preston in pursuing a FedEx vehicle on public roads.  Winn stated that he pursued and stopped a FedEx tractor-trailer truck after he saw it run a stop sign on Republican Drive.  (Dep. of M.A. Winn, ECF No. 45-4 at 1205-1206.)  FedEx does not point to evidence that suggests it has disciplined or warned Winn since learning of the stop, nor has the Court found such evidence upon a review of the record.  See Pharos Capital, 535 F. App'x at 523.  (See Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334.)

FedEx makes two arguments that Winn is not similarly situated to Preston with regards to this stop.  (See Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334.)  First FedEx claims that, even though Winn pursued the truck on public streets, he "did not bring the [truck] to [a] stop on city streets."  (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334.)  The Court finds that this caveat is not relevant, because the dangerous part of both behaviors appears to be the pursuit on public roads, not the stop itself.  Ercegovich, 154 F.3d at 352.  Second, FedEx claims that the situations are different, because "[t]he first FedEx learned of this behavior was at Winn's deposition, which took place on September 25, 2018."  (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334.)  FedEx provides no citation to the record in support of this contention, nor does this statement appear in either parties' statements of material fact.  (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334; see Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 and Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53.)  Winn testified that he did not report the encounter to his superiors, but FedEx has pointed to no evidence that could prove that FedEx never learned of the Winn's pursuit.  See Pharos Capital, 535 F. App'x at 523.  (See Dep. of M.A. Winn, ECF No. 45-4 at 1208.)  Given that the stop itself occurred on FedEx property, a jury may reasonably conclude that FedEx knew or should have

known about the pursuit.  (See Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2229 (stating that the parties do not dispute that a FedEx Vice President stated he had footage of Preston's stop of a FedEx truck on public roads surrounding the FedEx hub).)  FedEx's arguments notwithstanding, the Court finds that there is a genuine dispute as to whether Preston and Winn are similarly situated because of their pursuits of FedEx vehicles on public roads.

## IV.     Retaliation

### a.  Substantive Law

The McDonnell-Douglas framework also applies to claims of retaliation.  Hillman v. Shelby Cty., No. 05-2052-STA-tmp, 2012 U.S. Dist. LEXIS 40075, at *28 (W.D. Tenn. Mar. 23, 2012).   "In order to establish a prima facie case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).  The burden of production then shifts to the defendant to show that the plaintiff was terminated for legitimate, non-discriminatory reasons.  Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008).

### b.  Discussion

Preston claims that FedEx terminated him in retaliation for filing an internal complaint against Parker for discrimination in connection with his October 2015 warning letter.  (See. Pl.'s Resp. Opp. Mot. Summ. J., ECF No. 44 at 576; see also Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216 (stating that the parties do not dispute that Preston filed an internal discrimination complaint against Parker in connection with the October 2015 warning letter).)

Title VII "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014). Internal complaints, like the one Preston made against Parker, "constitute protected activity for purposes of establishing a prima facie case of retaliation." Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 F. App'x 651, 655 (6th Cir. 2012), as amended (Oct. 17, 2012). Preston has directed the Court to sufficient evidence to survive summary judgment on the first prong of a prima facie case of retaliatory termination.

The Court next considers whether there is a genuine dispute as to the second prong, whether FedEx knew about Preston's complaint. The parties do not dispute that, "On October 13, 2015, Preston, Parker, Toperzer, Lopez, and Richards took part in a GFTP telephonic conference regarding the October 5 Warning Letter. On this call, Preston stated he filed an [internal discrimination complaint] against Parker and therefore objected to her continued participation on the call." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217.) The parties also do not dispute that "Parker was told about the EEO before the teleconference call on October 13." (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217-18.) By October 13, 2015, Parker knew of Preston's internal discrimination complaint. (Id.) Preston therefore survives summary judgment on the second prong.

FedEx does not dispute that termination is an adverse employment action, so the Court turns to the fourth element, causal connection. (Def.'s Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 328.) In some circumstances, temporal proximity alone may be sufficient to support an inference of a causal connection in a Title VII retaliation case. Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000); Shefferly v. Health All. Plan of Michigan, 94 F. App'x 275, 285

(6th Cir. 2004) (finding that knowledge followed by an adverse action twenty-one days later is sufficient evidence of causal connection to survive summary judgment.)  In this case, Preston was terminated a little over a month and a half after he made his internal complaint, and about a month after Parker was told about the complaint in a conference call.  (Pl.'s Resp. Def.'s Material Facts, ECF No. 44-2 at 633; Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2216-18.)  Parker personally knew about the internal complaint.  (Def.'s Resp. Pl.'s Add. Material Facts, ECF No. 53 at 2217-18.)  The Court finds that this undisputed personal knowledge and the brief timeframe together create a genuine dispute as to whether there was a causal connection between Preston's internal complaint and his termination.

## V.    Pretext

### a. Substantive Law

If a plaintiff makes a prima facie case of discrimination or of harassment, the burden of production, but not of persuasion, then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142-43 (2000).  The plaintiff then must demonstrate that the defendant's proffered reason was a pretext for discrimination.  Id. at 143.  A plaintiff may establish pretext by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action."  Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008).

### b. Discussion

In its Motion for Summary Judgment, FedEx states that it terminated Preston "for an egregious violation of policy that put himself, the public, and the company at risk." (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 322.) Preston's termination letter states, "The Acceptable Conduct Policy (P2-5) provides that recurrent patterns of misconduct cannot be tolerated. Therefore, your employment is terminated effective today." (Termination Letter, ECF No. 48-3 at 2105; <u>see</u> FedEx Acceptable Conduct Manual, ECF No. 37-9 at 510-11 ("Based on the severity of the occurrence an employee may be terminated with less than three notifications of deficiency within a 12-month period.").) The Acceptable Conduct Policy further states, "Recurrent patterns of misconduct cannot be tolerated. Normally, a recurrent pattern of misconduct consists of at least two occurrences of the same or similar conduct in the past 5 years." (FedEx Acceptable Conduct Manual, ECF No. 37-9 at 510.) To summarize, FedEx states two different but related reasons for Preston's termination: that he committed an "egregious violation of policy" that posed a safety risk, and that he displayed a "recurrent pattern of misconduct."

### i. There is a genuine dispute as to whether Preston committed an "egregious violation"

Preston directs the Court to sufficient evidence to create a genuine dispute as to whether FedEx's terminated him for a safety violation. As stated above, Winn pursued and stopped a FedEx tractor-trailer after he saw it run a stop sign on Republican Drive. (Dep. of M.A. Winn, ECF No. 45-4 at 1205-1296.) Winn also testified that he believed performing the pursuit and stop was a part of his job duties. (Dep. of M.A. Winn, ECF No. 45-4 at 1207 (answering "yes" when asked, "did you believe that that was part of your job duties?").) A jury might reasonably conclude

that, if Winn believed that pursuit of a vehicle was part of the safety specialist's duties, then such an action was not egregious enough to warrant termination.

As stated above, FedEx claims that Winn's behavior is less serious because, even though Winn pursued the truck on public streets, he "did not bring the [truck] to stop on city streets." (Mem. Supp. Mot. Summ. J., ECF No. 37-1 at 334.) A jury may reasonably conclude that the pursuit on public roads is far more dangerous than the stop. Winn's testimony that he believed pursuit on public roads was part of the safety specialist's job duties and the lack of any evidence suggesting that FedEx has warned Winn since learning of the pursuit, each create a genuine dispute as to whether FedEx genuinely believed that such a pursuit was a sufficiently "egregious violation of policy" to warrant termination.

> ii. *There is a genuine dispute as to whether the October 2012 letter and the October 2015 letter are sufficient to explain FedEx's behavior*

Preston also points to sufficient evidence to create a genuine dispute as to whether FedEx terminated him because he displayed a "recurrent pattern of misconduct." When viewed in the light most favorable to Preston, the termination letter only cursorily mentions these two letters, and instead focuses on the stop of the FedEx truck. (See Warning Letter/Termination, ECF No. 48-3 at 2106.) A jury may reasonably interpret the termination letter to conclude that these two letters, alone, did not actually motivate FedEx. Additionally, a jury may reasonably infer that the two letters alone do not fully explain FedEx's actions, because FedEx did not terminate Preston until his warning letter for the truck stop.

> iii. *There is a genuine dispute as to whether the three letters together constitute "same or similar" conduct*

There is also a genuine dispute as to whether the use of all three letters for a "recurrent pattern" termination is pretextual. A jury may reasonably conclude that Preston's interaction with

a security officer in 2015 and his disagreement with a coworker in 2012 is not the "same or similar" to performing an unauthorized pursuit of a vehicle on public roads. (See Dep. of Ronnie White, ECF No. 46-5 at 1830 (stating that the 2012 warning letter was not issued for an unsafe act).) The jury may further reasonably conclude that these earlier interpersonal conflicts are so unlike an unauthorized traffic stop that FedEx must not have actually believed that the three letters formed a "recurrent pattern."

## VI.     Conclusion

For the reasons set forth above, the Court finds that there is a genuine dispute as to whether Preston was terminated because of his race, his sex, or his protected activity under Title VII. The Court further finds that there is a genuine dispute as to whether FedEx's offered reasons for Preston's termination are pretextual. The Motion for Summary Judgment is therefore DENIED.

**IT IS SO ORDERED**, this 11th day of April, 2019.

　　　　　　　　　　 /s/ Jon McCalla
　　　　　　　　　　JON P. McCALLA
　　　　　　　　　　UNITED STATES DISTRICT COURT JUDGE